COMMONWEALTH *vs.* LOUIS CATALINA.

Essex. March 5, 1990. - July 3, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Homicide. Controlled Substances. Practice, Criminal,* Indictment. *Felony-Murder Rule. Assault and Battery. Wanton or Reckless Conduct. Grand Jury. Proximate Cause.*

Evidence presented to a grand jury that the defendant feloniously distributed heroin to a person who then died from injecting the drug could not, as matter of common law, support an indictment for involuntary manslaughter on the theory of "unlawful-act" manslaughter. [782-783]

Discussion of the elements of involuntary manslaughter based on an unlawful act in light of this court's decision in *Commonwealth* v. *Matchett*, 386 Mass. 492 (1982). [783-787]

Announcement of the abandonment of the common law crime of involuntary manslaughter based on an unlawful act, except for cases where an unintentional death results from the commission of a battery (*Commonwealth* v. *Sheppard*, 404 Mass. 774 [1989]) or from the commission of wanton and reckless conduct (*Commonwealth* v. *Welansky*, 316 Mass. 383 [1944]). [787-789]

Evidence presented to a grand jury that the defendant feloniously distributed heroin to a known addict who then died from injecting the drug supported an indictment for involuntary manslaughter under the principles set forth in *Commonwealth* v. *Welansky*, 316 Mass. 383 (1944). [789-792]

INDICTMENT found and returned in the Superior Court Department on February 1, 1988.

A motion to dismiss was heard by *Peter F. Brady*, J., and the case was reported by him to the Appeals Court. The Supreme Judicial Court granted a request for direct review.

*S. Jane Haggerty*, Assistant District Attorney, for the Commonwealth.

*David A. Whynott* for the defendant.

GREANEY, J. A grand jury in Essex County returned indictments against the defendant for involuntary manslaughter, G. L. c. 265, § 13 (1988 ed.), and for the unlawful distribution of a class A controlled substance, namely heroin, G. L. c. 94C, § 32 (*a*) (1988 ed.). The indictments stemmed from testimony before the grand jury of the defendant's sale of heroin to Grace Randazza and her death after use of the heroin. The defendant filed a motion to dismiss the manslaughter indictment on various grounds, including an assertion that the evidence presented to the grand jury was insufficient to justify the return of an indictment for involuntary manslaughter. See *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982). A judge of the Superior Court did not rule on the motion to dismiss. Instead, acting pursuant to Mass. R. Crim. P. 34, 378 Mass. 905-906 (1979),[1] the judge reported the following two questions to the Appeals Court:

> "1. Was the evidence presented to the Grand Jury sufficient to support an indictment for manslaughter under the principle of 'unlawful act-manslaughter'?
> "2. Was the evidence presented to the Grand Jury sufficient to support an indictment for manslaughter under the principles of *Commonwealth* v. *Welansky*, 316 Mass. 383 (1944) (wanton and reckless conduct)?"[2]

We allowed a joint application for direct appellate review. We conclude that the defendant cannot be charged on the theory of unlawful-act manslaughter, but that the evidence before the grand jury is sufficient to support his prosecution under *Commonwealth* v. *Welansky*, 316 Mass. 383 (1944).

---

[1]This rule of criminal procedure reads as follows:

"If, prior to trial, or, with the consent of the defendant, after conviction of the defendant, a question of law arises which the trial judge determines is so important or doubtful as to require the decision of the Appeals Court, the judge may report the case so far as necessary to present the question of law arising therein. If the case is reported prior to trial, the case shall be continued for trial to await the decision of the Appeals Court."

[2]In connection with the report, the Commonwealth was designated the appellant.

The evidence presented to the grand jury, viewed in the light most favorable to the Commonwealth, indicated the following. On the afternoon of October 31, 1986, Christine Murphy Pratt, who was driving her automobile in Gloucester, picked up Peter Gabriele. Gabriele told Pratt that he was looking for heroin. Pratt advised Gabriele that the defendant had "some dope." Gabriele knew the defendant as a heroin dealer and had previously purchased heroin from him.

Pratt and Gabriele drove to a café where they picked up the defendant and Randazza. After Randazza and the defendant entered the vehicle, there was a conversation about purchasing heroin. The defendant told Randazza that he had "Seven-Life" heroin which was "very potent stuff [and] that she shouldn't fool around with it." The defendant told Randazza not to "do a whole one."

Pratt dropped Gabriele and Randazza at a "sub shop" and then drove the defendant a short distance to his house. The defendant quickly entered his house and returned to Pratt's car. On the return trip to the sub shop, Pratt purchased one bag of "Seven-Life" heroin from the defendant for $50.

Randazza and Gabriele were in the sub shop when the defendant returned. Randazza said to Gabriele, "[H]e's here, give me the money." Gabriele witnessed the defendant hand Randazza three bags of "Seven-Life" heroin. Randazza then handed Gabriele two bags for which he had paid $100. She kept one bag for herself.

Randazza was known to the defendant and to Pratt as a heroin user, and to Gabriele as a heroin addict. The defendant acknowledged that Randazza could not handle a full bag of "Seven-Life" heroin. The defendant further acknowledged that "he had helped [Randazza] from overdosing" on several occasions. The defendant also admitted to the police that he was aware of another overdose of "Seven-Life" heroin which had almost resulted in an individual's death.

Randazza returned home between 2:30 P.M. and 3:30 P.M. At approximately 5:30 P.M., a relative of Randazza found her unconscious in a bedroom in his home. His attempt at resuscitation was unsuccessful. Found near Randazza were a hy-

podermic needle, syringe and "cooker spoons," which were turned over to the police. An analysis of the spoons revealed heroin residue; no controlled substance was found in the needle and syringe.

Randazza was transported to the hospital where a nurse retrieved a glassine bag labeled "Seven-Life" from her dungaree pocket. The glassine bag was turned over to the police; analysis revealed that it contained heroin residue.

An autopsy was performed on the body of Randazza. According to the pathologist's report, Randazza died of "pulmonary congestion as a result of combined drug use." The combined drugs were heroin and alcohol. Although the alcohol alone would not have caused her death, according to the pathologist, the heroin found in her body was a lethal dose.

1. *Unlawful-act manslaughter.* The first reported question asks whether the evidence presented to the grand jury was sufficient to support the defendant's prosecution for manslaughter under the theory of so-called unlawful-act manslaughter. The indictment, however, reads in relevant part as set forth below,[3] and is framed in terms of whether the defendant committed manslaughter under the principles set forth in *Commonwealth* v. *Welansky*, 316 Mass. 383 (1944). There is an obvious reason for this. Under our common law, involuntary manslaughter cannot be charged under the theory of unlawful-act manslaughter when a death occurred during the commission of a felony. The distribution of heroin, a class A controlled substance is a felony. See G. L.

---

[3]The indictment alleges that the defendant "did assault and beat Grace Randazza and by such assault and beating did kill Grace Randazza, in that he did, with wanton and reckless disregard of the probable harmful consequences of his action, distribute to Grace Randazza a controlled substance in Class A of General Laws, c. 94C, § 31, to wit: heroin, and by such action caused the death of Grace Randazza." In *Commonwealth* v. *Campbell*, 352 Mass. 387, 397 (1967), we stated that the type of manslaughter defined by the *Welansky* case involved "an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct." See also *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 747 (1975). As can be seen, the indictment in this case tracks this language.

c. 94C, § 32 (*a*) (1988 ed.); G. L. c. 274, § 1 (1988 ed.). Involuntary manslaughter of the type mentioned in the first reported question presently pertains only to deaths occurring in the commission of misdemeanors or other acts malum in se, but not to the commission of felonies. See *Commonwealth v. Campbell*, 352 Mass. 387, 397 (1967).

A defendant cannot be prosecuted for an act which was not a crime when it was performed, *Lembersky v. Parole Bd. of the Dep't of Correction*, 332 Mass. 290, 293 (1955). An indictment which is narrow and precise in scope cannot be read to encompass a new and different definition of the crime that did not exist at the time of the occurrence which gave rise to it. For these reasons, unlawful-act manslaughter cannot be used as a basis to prosecute the defendant in this case.

The parties, however, have briefed and argued questions about the state of certain aspects of involuntary manslaughter after the decision in *Commonwealth v. Matchett*, 386 Mass. 492 (1982), which modified our common law of felony-murder. The issues they raise are important, and they deserve resolution in order to clarify the state of our manslaughter law. See *Commonwealth v. Giang*, 402 Mass. 604, 608 (1988); *Wellesley College v. Attorney Gen.*, 313 Mass. 722, 731 (1943). We proceed to consider them.

There is no statutory definition of manslaughter in Massachusetts; its elements are derived from common law. *Commonwealth v. Godin*, 374 Mass. 120, 126 (1977), cert. denied, 436 U.S. 917 (1978). We have said that "[i]nvoluntary manslaughter is an unlawful homicide, unintentionally caused (1) in the commission of an unlawful act, malum in se, [4] not amounting to a felony nor likely to endanger life . . ., or (2) by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct." *Commonwealth v. Campbell*, *supra* at 397. The first type of manslaughter mentioned in

---

[4]*Commonwealth v. Adams*, 114 Mass. 323, 324 (1873), defines an act malum in se as an act done wilfully or corruptly which causes injury to person or property.

this passage is sometimes called unlawful-act manslaughter, while the second type is manslaughter according to the principles stated in *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944). We have also consistently stated that " '[a] battery that causes death is manslaughter.' " *Commonwealth* v. *Sheppard*, 404 Mass. 774, 776 (1989), quoting *Commonwealth* v. *Bianco*, 388 Mass. 358, 362 (1983). See *Commonwealth* v. *Mahnke*, 368 Mass. 662, 703 (1975), cert. denied, 425 U.S. 959 (1976); *Commonwealth* v. *Campbell, supra*; *Commonwealth* v. *Sostilio*, 325 Mass. 143, 145 (1949); *Commonwealth* v. *Gricus*, 317 Mass. 403, 404 (1944); *Commonwealth* v. *Welansky, supra* at 401.[5] This type of manslaughter recognizes the danger inherent in the intentional infliction of bodily harm associated with a criminal battery.[6]

The present state of unlawful-act manslaughter suffers from the same problem that affected second degree felony murder prior to the *Matchett* decision. In *Commonwealth* v. *Matchett, supra* at 492, we moderated our previous common law felony-murder rule, which automatically imposed "criminal liability for homicide on all participants in a certain com-

---

[5]The battery causing death theory of manslaughter is not exactly the same as *Welansky* manslaughter. In *Commonwealth* v. *Sheppard, supra* at 776 n.1, we rejected the defendant's argument "that a 'battery' to be the basis of a conviction of involuntary manslaughter, must first be found to have amounted to 'wanton or reckless conduct.' "

[6]Our recent decision in *Commonwealth* v. *Sheppard, supra* illustrates this type of involuntary manslaughter. In that case, the defendant punched the victim in the face causing him to fall backward and hit his head. The victim died as the result of a severe skull fracture. We noted that the trial judge instructed the jury as follows: "you [must] find that the Commonwealth ha[s] proved [that] the defendant punched the victim. Further, there would have to be proof . . . this punching, was harmful. A harmful battery occurs when the touching is done with such violence that harm is likely to result." 404 Mass. at 777. We then went on to state "[g]iven this instruction, the fact that the defendant was six feet tall and weighed 185 pounds while the victim was only five feet seven inches tall and weighed 125 pounds, the fact that the punch was of sufficient force to cause the victim's head to hit the street and cause a severe skull fracture and brain hemorrhage, and the evidence that the defendant called the blow a 'knockout punch', the jury's finding of an intentional battery done 'with such violence that harm [was] likely to result' was a sufficient basis to support the manslaughter conviction." *Id.*

mon criminal enterprise if a death occurred in the course of that enterprise." *Id.* at 502, quoting *Commonwealth* v. *Watkins*, 375 Mass. 472, 486 (1978). We reasoned that "[a] felony-murder rule that punishes all homicides committed in the perpetration of a felony whether the death is intentional, unintentional or accidental, without the necessity of proving the relation of the perpetrator's state of mind to the homicide, violates the most fundamental principle of the criminal law — 'criminal liability for causing a particular result is not justified in the absence of some culpable mental state in respect to that result,' " 386 Mass. at 506-507, quoting *People* v. *Aaron*, 409 Mich. 672, 719 (1980). Accordingly, we held that a felony must pass one of two tests before it may be used as a predicate offense for a second degree felony-murder prosecution. The felony must either (1) be "inherently dangerous," exhibiting by the mere fact of its commission "a conscious disregard for human life, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty," 386 Mass. at 507, quoting *Commonwealth* v. *Bowden*, 456 Pa. 278, 287 (1973), or (2) if not inherently dangerous, be committed in a manner which "involved circumstances demonstrating the defendant's conscious disregard of the risk to human life." *Id.* at 508.

As was the case under our common law felony-murder rule prior to the *Matchett* decision, a defendant presently may be found guilty of unlawful-act manslaughter if a death is caused by his commission of a misdemeanor or other unlawful act, without regard to the nature of the act or the dangerousness of the defendant's conduct. The Supreme Judicial Court of Maine in *State* v. *Pray*, 378 A.2d 1322, 1324 (Me. 1977), has pointed out the problem in this rule: "The flaw in [this] concept is that a person may be convicted of unlawful-act manslaughter even though the person's conduct does not create a perceptible risk of death. Thus, a person is punished for the fortuitous result, the death, although the jury never has to determine whether the person was at fault with respect to the death. The concept violates the important principle that a person's criminal liability for an act should be pro-

portioned to his or her moral culpability for that act. The wrongdoer should be punished for the unlawful act and for homicide if he or she is at fault with respect to the death, but should not be punished for a fortuitous result merely because the act was unlawful."

It is not surprising, therefore, that unlawful-act involuntary manslaughter has been severely criticized. LaFave & Scott, Criminal Law 602 (1972); Wilner, Unintentional Homicide in the Commission of an Unlawful Act, 87 U. Pa. L. Rev. 811 (1939). The principle that underpins the offense perpetuates the notion of constructive crime which has been generally discredited. The Model Penal Code rejects the concept of unlawful-act manslaughter altogether. Under the Code, a defendant's conduct must be reckless before he can be punished for manslaughter, Model Penal Code and Commentaries, Official Draft & Revised Comments 210.3(1)(a) (1980); and the Code establishes a separate crime of criminally negligent homicide. Model Penal Code, *supra* at § 210.4. Some States have adopted this approach.[7] Other States have modified their manslaughter law by requiring, either by case law or statute, that the underlying unlawful act meet some minimum standard of seriousness. Some of those States focus on the perpetrator's mental state and require

---

[7]See, e.g., Conn. Gen. Stat. Ann. § 53A-56 (West 1985) (a person who "recklessly causes the death" of another is guilty of second degree manslaughter); N.Y. Penal Law § 125.15 (Lawyers Co-op. 1984) (same); Wis. Stat. Ann. § 940.06 (West Supp. 1989) (person who "recklessly causes the death" of another is guilty of second degree reckless homicide).

These jurisdictions also follow the Model Penal Code in establishing separate statutory crimes to cover homicides caused by criminally negligent behavior. See Conn. Gen. Stat. Ann. § 53a-58 (West 1985); N.Y. Penal Law § 125.10 (Lawyers Co-op. 1984); Wis. Stat. Ann. § 940.08 (West 1982 & Supp. 1989) (negligent use of various enumerated weapons).

The Revised Criminal Code of Massachusetts, proposed by the Massachusetts Criminal Law Revision Commission in 1971, but never enacted, mirrored the Model Penal Code's approach. Section 3 of the proposed code would have required proof of recklessness before a defendant could be convicted of involuntary manslaughter. Section 5 of that code would have established a new statutory crime of criminally negligent homicide. See Proposed Criminal Code of Massachusetts 96-98 (Lawyers Co-op. 1972).

recklessness or some form of negligence.[8] Others focus on the risk to human life or safety inherent in the underlying act,[9] or use an approach which is an amalgam of one or more of the above.[10]

We believe that unlawful-act manslaughter should be abandoned in Massachusetts except for appropriate cases which are based on the principle that a battery that causes death is manslaughter. The latter principle has long been part of our common law and has been applied, as the *Sheppard* case illustrates, see note 6, *supra*, in circumstances in which the defendant is, or should be, cognizant of the fact that the battery he is committing endangers human life. Apart from this principle, unlawful-act manslaughter has

---

[8]See, e.g., *People v. Meyer*, 46 Mich. App. 357, 367 (1973) (unlawful act must be "accompanied by a reckless disregard for the safety of others"); Minn. Stat. Ann. § 609.20 (2) (West Supp. 1990) (unlawful act is "committing or attempting to commit a misdemeanor . . . with such force and violence that death of or great bodily harm to any person was reasonably foreseeable"); *State v. Nosis*, 22 Ohio App. 2d 16, 18 (1969) (unlawful act "must be one that would be reasonably anticipated by an ordinarily prudent person as likely to result in such killing"); *Commonwealth v. Busler*, 445 Pa. 359, 361 (1971) (in motor vehicle context, unlawful act must, either by itself or in conjunction with the attendant circumstances, "evidence a disregard of human life or an indifference to consequences") quoting *Commonwealth v. Clowser*, 212 Pa. Super. 208, *Darnell v. Commonwealth*, 6 Va. App. 485, 491 (1988) (unlawful act must include criminal negligence, defined as "conduct evidencing either a wilful or wanton disregard for the safety of others").

[9]See, e.g., *State v. Puryear*, 121 Ariz. 359, 363 (Ct. App. 1979) (unlawful act must be "inherently dangerous to human life or safety"); Iowa Code Ann. § 707.5, subd. 2 (West 1979) (defining involuntary manslaughter as death caused by "the commission of an act in a manner likely to cause death or serious injury"); *State v. Champ*, 172 Kan. 737, 739 (1952) (unlawful act must be a "misdemeanor denounced by statute for the purpose of protecting human life and safety").

[10]See, e.g., *People v. Stuart*, 47 Cal. 2d 167, 173 (1956) (unlawful act must be committed with criminal intent or criminal negligence, and "must be dangerous to human life or safety"); *United States v. Walker*, 380 A.2d 1388, 1390 (D.C. App. 1977) (unlawful act must be a "misdemeanor dangerous in itself," or must display "an unreasonable failure to perceive the risk of harm to others"); Ill. Rev. Stat. Ann. c. 38, § 9-3 (Smith-Hurd Supp. 1989) (underlying acts, whether lawful or unlawful, must be "likely to cause death or great bodily harm" and be performed recklessly).

been rarely used as a basis for prosecution, and then in cases that are factually eccentric.[11] Any effort to redefine the basis of culpability for unlawful-act manslaughter in terms of the various standards described above, see notes 8, 9, and 10, *supra*, would cast the offense in terms of a standard which comes close to duplicating the standard set forth in *Commonwealth* v. *Matchett*, *supra* at 508, for felony-murder (conduct involving a "conscious disregard of the risk to human life"), or the standard for implied malice in murder described in *Commonwealth* v. *Starling*, 382 Mass. 423, 426 (1981) (conduct which, according to common experience, involves a plain and strong likelihood of death). The resulting overlap would make it virtually impossible to instruct a jury in a manner which would enable them sensibly to differentiate between murder and manslaughter, and an unnecessary layer of confusion would be added to our already complicated common law of homicide. Further, negligence cannot be a proper common law basis for liability because "[t]here is in Massachusetts at common law no such thing as 'criminal negligence'." *Commonwealth* v. *Welansky*, *supra* at 400. Where the Legislature had determined that a negligently caused death, or a death occurring during the commission of a misdemeanor, should be punished as manslaughter it has enacted specific statutes. See, e.g., G. L. c. 90, § 24G (*a*) and (*b*) (1988 ed.) (punishing motor vehicle homicide occurring as a result of negligent, reckless, and alcohol impaired driving).

There is no doubt of the desirability of legislative consideration of the homicide law with a view toward simplification and modernization. See *Commonwealth* v. *Starling*, *supra* at 428-429. However, in the absence of definitive action by the Legislature, we must bring our involuntary manslaughter law in line with the *Matchett* decision. See LaFave & Scott, Criminal Law 602 (1972 ed.). For the reasons stated above,

---

[11]For example, in *Commonwealth* v. *Mink*, 123 Mass. 422 (1877), the defendant was convicted of manslaughter after she caused the victim's accidental death when he attempted to prevent her from committing suicide by shooting herself.

a person henceforth may be prosecuted for involuntary manslaughter only for causing an unintentional death (1) during the commission of wanton or reckless conduct, as defined in *Commonwealth* v. *Welansky, supra,* or (2) during the commission of a battery, under the principles set forth in *Sheppard, supra,* and the other cases cited therein.

For the reasons previously stated, the answer to the first reported question is "no."

2. *Welansky manslaughter.* The second reported question asks whether the evidence before the grand jury supports the defendant's indictment for manslaughter under the principles set forth in *Commonwealth* v. *Welansky,* 316 Mass. 383 (1944). *Welansky* holds that involuntary manslaughter includes an unlawful homicide unintentionally caused by wanton or reckless conduct. "The essence of wanton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." *Id.* at 399. See *Commonwealth* v. *Gallison,* 383 Mass. 659, 665 (1981). Moreover, we have approved jury instructions which stated that "even if a particular defendant is so stupid [or] so heedless . . . that in fact he did not realize the grave danger, he cannot escape the imputation of wanton or reckless conduct in his dangerous act or omission, if an ordinary normal man under the same circumstances would have realized the gravity of the danger." *Commonwealth* v. *Welansky, supra* at 398-399. See *Commonwealth* v. *Godin,* 374 Mass. 120, 129, cert. denied, 438 U.S. 917 (1977). Thus, under *Welansky,* a defendant's subjective awareness of the reckless nature of his conduct is sufficient, but not necessary, to convict him of involuntary manslaughter. Conduct which a reasonable person, in similar circumstances, would recognize as reckless will suffice as well.

We inquire whether the evidence presented to the grand jury was sufficient to support the defendant's indictment for involuntary manslaughter under the *Welansky* theory as described above. The defendant has not yet been tried on this charge, so we are not concerned with whether sufficient evi-

dence exists to warrant a finding of his guilt beyond a reasonable doubt. Rather, we consider only whether the information before the grand jury was adequate to establish his identity and probable cause to arrest him for the crime charged. See *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982). Probable cause requires facts sufficient to warrant a person of reasonable caution in believing that an offense has been committed. See *Carroll* v. *United States*, 267 U.S. 132, 161 (1923).

Here, evidence was presented that the defendant committed the felony of distributing heroin (in fact a potent form of the substance known as "Seven-Life" heroin).[12] The distribution of heroin is a particularly serious crime. See G. L. c. 94C, § 32 (*a*). Between 225 and 315 people in this Commonwealth alone died from heroin abuse during the year ending in March, 1988. Recognizing the critical nature of the heroin use problem, both Congress and our Legislature have placed heroin in the most dangerous category of controlled substances. See 21 U.S.C. § 812 (1982); G. L. c. 94C, § 31 (1988 ed.). This classification reflects a legislative determination that heroin has "a high potential for abuse," "no currently accepted medical use" in the United States, and lacks "accepted safety" for use even under medical supervision. 21 U.S.C. § 812 (*b*)(1) (West 1981); G. L. c. 94C, § 3 (1) (1988 ed.). Violation of our statute proscribing heroin distribution carries a severe penalty of up to ten years in prison and $10,000 in fines. See G. L. c. 94C, § 32 (*a*) (1988 ed.). Repeat offenders face a mandatory minimum prison sentence of five years, and a maximum of fifteen years. See G. L. c. 94C, § 32 (*b*) (1989 Supp.).

The New York Supreme Court has aptly described the risks inherent in the defendant's action. In *People* v. *Cruciani*, 70 Misc. 2d 528 (N.Y. 1972), the court noted the

---

[12]In addition, there was evidence that the defendant knew he was distributing a highly potent brand of heroin, that Randazza had a low tolerance for the drug and had overdosed in the past, that she could not handle a whole bag of this type of heroin, and that she needed to be warned not to "do a whole one."

high mortality rate associated with the injection of heroin, the marked variability in heroin concentration, and the fact that any substantial quantity of heroin injected regularly could easily contain a lethal concentration of the drug. The court concluded as follows: "From a careful study and analysis of the majority of prevailing legal precedents in the United States as well as the medical studies made and statistical data compiled, one can reasonably conclude that the consumption of heroin in unknown strength is dangerous to human life, and the administering of such a drug is inherently dangerous and does carry a high probability that death will occur. It is not unreasonable to conclude that the injection of heroin into the bloodstream of a human being constitutes a substantial and unjustifiable risk of death." 70 Misc. 2d at 536.[13] These considerations were pertinent when made in 1972, are even more pertinent today, and apply to the evidence presented to the grand jury.

The defendant's contention that the causal link between the heroin sale and Randazza's death was broken by Randazza's intervening conduct of injecting herself lacks merit. Intervening conduct that is reasonably foreseeable will not relieve the defendant of criminal responsibility. See *Commonwealth* v. *Askew*, 404 Mass. 532, 534 (1989). It is untenable to suggest that heroin consumption is not a reasonably foreseeable consequence of selling that drug to a known addict. We conclude that "the act of the customer in injecting [her]self is not necessarily so unexpected, unforeseeable or remote as to insulate the seller from criminal responsibility as a matter of law." *State* v. *Randolph*, 676 S.W.2d 943, 948 (Tenn. 1984). See *State* v. *Thomas*, 118 N.J. Super. 377, 380 (1972). See also *Ureta* v. *Superior Court*, 199 Cal. App. 2d 672, 676 (1962) ("The person who furnished [her]

---

[13]In some States the sale of a dangerous drug has been held to be a sufficient predicate for a felony-murder prosecution. See *People* v. *Poindexter*, 51 Cal. 2d 142, 149 (1958) (heroin); *State* v. *Randolph*, 676 S.W.2d 943, 947 (Tenn. 1984) (heroin); *Heacock* v. *Commonwealth*, 228 Va. 397, 403-404 (1984) (cocaine).

the narcotic is liable even though deceased did the actual administering of it").

The evidence before the grand jury furnishes probable cause to believe that the defendant committed involuntary manslaughter under the principles stated in the *Welansky* case. It follows that our answer to the second reported question is "yes."