## Commonwealth vs. Scott Vaughn.

No. 95-P-1779.

Hampden. February 7, 1997. - November 19, 1997.

Present: Kass, Greenberg, & Flannery, JJ.

*Homicide. Wanton or Reckless Conduct. Practice, Criminal,* Instructions to jury, Argument by prosecutor.

At the trial of an indictment alleging involuntary manslaughter, there was sufficient evidence for the jury to find that the defendant was subjectively aware, or that a reasonable person would have been aware,· that injecting the victim with heroin created a high degree of likelihood that substantial harm to the victim would result. [821-823]

At the trial of an indictment for involuntary manslaughter in which the evidence showed that the victim died of allergic shock after the defendant injected her with heroin, the prosecutor's argument, inviting an inference from the defendant's conduct after the victim passed out that the defendant was aware of the risks of injecting heroin, was not prejudicial in context and in light of the judge's instructions, and there was no error, on the state of the evidence, in the judge's refusal to give a requested instruction that the jury were not to consider the defendant's failure to act as a basis for a finding of guilt. [823-827]

Indictment found and returned in the Superior Court Department on October 20, 1993.

The case was tried before *Judd J. Carhart*, J.

*Brownlow M. Speer*, Committee for Public Counsel Services, for the defendant. ·

*Lori K. Odierna*, Assistant District Attorney, for the Commonwealth.

Flannery, J. A Superior Court jury convicted the defendant of involuntary manslaughter, possession of heroin, and possession of a hypodermic needle after hearing evidence that the defendant injected Aileen St. Sauveur with heroin and that soon thereafter she died. On appeal, the defendant challenges only the conviction of manslaughter. He argues that there was insufficient

evidence that he acted recklessly because the Commonwealth made no factual showing that his conduct "created a high degree of likelihood that substantial harm would result to the victim." *Commonwealth* v. *Flynn*, 420 Mass. 810, 815 (1995). He further contends that, even if there were sufficient evidence to support the conviction, he is entitled to a new trial because he was prejudiced by the prosecutor's closing argument, which repeatedly referred to the defendant's failure to seek medical assistance for the victim, and by the judge's refusal to give the defendant's requested instruction that the jury may not base a verdict of manslaughter "on any inaction or failure to act or delay in acting on the part of the defendant." We affirm.

1. *The facts.* Viewing the evidence in the light most favorable to the Commonwealth, the jury could have found the following facts.[1]

On September 4, 1993, at approximately 11:00 A.M., the defendant "shot up" a bag of heroin at the home he shared with his mother at 223 Southern Drive in Chicopee. At around 4:30 P.M., the defendant went to the McKinstry Avenue bridge, a place where people were known to "party." Aileen St. Sauveur arrived and spoke with the defendant. They went to his house where she drank wine coolers and he drank beer; they were waiting for his mother to come home so that they could use her car.

When the defendant's mother returned, the defendant drove her car to Holyoke with St. Sauveur, who gave him twenty dollars to purchase heroin. After making the purchase, they returned to the defendant's house and went into his room. The defendant "cooked up" the heroin in a bottle cap. The defendant said he and St. Sauveur agreed to split the heroin since he had driven her to the supplier. He further claimed that St. Sauveur and he had "gotten high" together about four times previously that year.

The defendant said St. Sauveur asked him to help her "shoot up" since she had small veins. She put a belt around her arm and tightened it. With his thumb, the defendant felt for her vein, located it, and injected a syringe filled with half the bag of heroin — now in liquid form — into her. After cleaning the needle, the defendant injected himself with the remainder. He

---

[1]The defendant's two-page statement to the police provides many of the facts.

cleaned the needle again and put it in a tin can in which he kept his paraphernalia. The needle was later recovered by the police pursuant to the defendant's consent to search his room.

The defendant noticed that St. Sauveur became groggy about five minutes after he injected himself. She passed out on his bed. He tried to wake her up but could not. Before leaving the room, he rolled her onto her stomach so "in case she threw up, she wouldn't choke." The defendant went downstairs for some time and then returned to the bedroom. Although the victim still had a pulse and was breathing, she did not rouse in response to his slapping her. The defendant went back downstairs and watched television. After ten or fifteen minutes, he returned upstairs where St. Sauveur was still unresponsive; now she was turning blue and had no pulse.

The defendant and his mother brought the victim outside, leaned her against the side of the building, and then went back inside their home where the defendant instructed his mother to call an ambulance. Neighbors sitting outside then saw the defendant come back outside three times to try to rouse the victim by slapping her and lifting her eyelids. He was yelling: "Happy Birthday, bitch . . . nice fucking birthday." The neighbors called the police.

Paramedics and the police arrived. St. Sauveur did not have a pulse, and her fingers were cold to the touch. Although the defendant was standing behind his door when they arrived, he told the paramedics that he knew nothing about St. Sauveur's condition and that he had spoken with her minutes before. The victim was transported to the hospital and pronounced dead.

Police officers on the scene questioned the defendant at his home. He initially said that he and St. Sauveur had been "party-ing" in his bedroom, that she went into the bathroom, and that she then left his house. He denied knowing how she got outside. The next day the defendant gave the police a signed statement in which he admitted that he had "shot up" the victim.

A forensic pathologist employed by the Commonwealth's chief medical examiner performed the autopsy on St. Sauveur. A toxicology report showed a blood alcohol level of .20 percent, but the pathologist said that the role of alcohol in her death was "minimal." He asserted that the ingestion of heroin caused her death. Although the amount of heroin-produced morphine in her system, thirteen micrograms per deciliter, fell below the "toxic level" of twenty, that fact was not significant because, regard-

less of amount, "the mechanism of heroin deaths is one of shock, allergic shock, very short acting in those who respond in that fashion to shock and lack of blood pressure and death." The pathologist said that he had performed a dozen autopsies in the past year in which the cause of death was heroin and that there were perhaps twenty cases in his western Massachusetts office that year.

The defendant testified in his own behalf, for the most part consistently with his statement to the police. He said he had been an alcoholic and heroin addict for approximately twenty years. In that time, he had taken drugs with many other individuals but had never seen anyone overdose. He was cross-examined extensively, and without objection, about his failure to call for help when St. Sauveur was unresponsive in his bedroom. It was established that the defendant had been a field medic while serving in the military.

2. *The sufficiency of the evidence.* "There is no statutory definition of manslaughter in Massachusetts; its elements are derived from common law." *Commonwealth* v. *Catalina*, 407 Mass. 779, 783 (1990). The Commonwealth proceeded on the theory that the defendant committed involuntary manslaughter "under the principles set forth in *Commonwealth* v. *Welansky*, 316 Mass. 383 (1944). *Welansky* holds that involuntary manslaughter includes an unlawful homicide unintentionally caused by wanton or reckless conduct. 'The essence of wanton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another.' *Id.* at 399." *Commonwealth* v. *Catalina*, 407 Mass. at 789.

The defendant does not contend that his act of injecting St. Sauveur with heroin was unintentional. Rather, he disputes the sufficiency of the evidence that this conduct involved a high degree of likelihood that substantial harm would result to St. Sauveur. The defendant says that the only evidence before the jury on the issue was the forensic pathologist's estimation that his office had handled twenty cases of deaths resulting from heroin in the previous year. Moreover, he says that the pathologist agreed that the amount of heroin-produced morphine was below the so-called "toxic level." The jury also heard testimony from a police officer that a twenty-dollar bag of heroin typically constitutes one "dose"; the defendant says that he could not

expect that substantial harm would result to St. Sauveur (a person with whom he previously had used heroin) by his injecting her with half a dose.

The defendant's argument ignores that courts long have recognized that injecting heroin is inherently dangerous. In *Commonwealth v. Catalina, supra,* the court held that the defendant supplier of a particularly potent form of heroin could be indicted on a theory of *Welansky*-type manslaughter. The court stated that:

> "The New York Supreme Court has aptly described the risks inherent in the defendant's action. In *People* v. *Cruciani,* 70 Misc. 2d 528 (N.Y. 1972), the court noted the high mortality rate associated with the injection of heroin, the marked variability in heroin concentration, and the fact that any substantial quantity of heroin injected regularly could easily contain a lethal concentration of the drug. The court concluded as follows: 'From a careful study and analysis of the majority of prevailing legal precedents in the United States as well as the medical studies made and statistical data compiled, one can reasonably conclude that the consumption of heroin in unknown strength is dangerous to human life, and the administering of such a drug is inherently dangerous and does carry a high probability that death will occur. It is not unreasonable to conclude that the injection of heroin into the bloodstream of a human being constitutes a substantial and unjustifiable risk of death.' 70 Misc. 2d at 536. These considerations were pertinent when made in 1972, and are even more pertinent today . . . ." *Id.* at 790-791 (footnote omitted).

See *Commonwealth* v. *Auditore,* 407 Mass. 793 (1990) (Commonwealth could maintain involuntary manslaughter indictment on the basis of *Commonwealth* v. *Welansky, supra,* against heroin supplier).

In *Commonwealth* v. *Perry,* 34 Mass. App. Ct. 127, 128, *S.C.,* 416 Mass. 1003 (1993), the defendant argued that a judge properly had dismissed an indictment for involuntary manslaughter where "there was no evidence that the heroin [she helped the decedent procure] was unusually potent or that the defendant knew it to be so." We disagreed, saying: "The nature of the defendant's conduct may be evaluated either by the

defendant's awareness of the reckless nature of the conduct (subjective standard), or by considering whether a reasonable person, in similar circumstances, would recognize the conduct as reckless (objective standard). . . . Considering the inherently dangerous nature of heroin, the defendant's conduct involved a high degree of likelihood that substantial harm would result to [the decedent]." *Id.* at 129-130. On further appellate review the Supreme Judicial Court explained that its holding in *Catalina* was not limited to situations where the heroin was particularly potent "because all heroin of unknown strength is inherently dangerous and carries a 'high probability that death will occur.' " *Id.* at 1004, quoting from *Commonwealth* v. *Catalina,* 407 Mass. at 791.

There was sufficient evidence for the jury to find that the defendant was subjectively aware, or that a reasonable person would have been aware, that injecting St. Sauveur with heroin, which has "a high potential for abuse, no currently accepted medical use in the United States, and lacks accepted safety for use even under medical supervision," *Commonwealth* v. *Catalina, supra* at 790 (citation omitted), created a high degree of likelihood that substantial harm would result. Contrary to the defendant's assertions, we do not believe that a jury — who, living in our society, are well aware of the dangers of heroin use — require expert evidence on the issue. Nor do we find persuasive the defendant's argument that the reasoning of *Catalina* and its progeny is inapplicable here because those cases examined the sufficiency of the evidence presented to the grand jury and not at trial. Cf. *Commonwealth* v. *Osachuk,* 43 Mass. App. Ct. 71 (1997) (upholding conviction for involuntary manslaughter based on defendant's injecting drugs into decedent and also supplying her with drugs and money for drugs).

3. *The defendant's failure to act and the defendant's proposed instruction.* The prosecutor in her opening statement to the jury urged them to "focus on what [the defendant] did and what he failed to do," and pointed out that, even when St. Sauveur was passed out, the defendant did not call for help and that "[s]he's dead because of what he did and what he failed to do." The defendant did not object, and there was substantial evidence in the Commonwealth's case about the defendant's failure to call for help or to assist paramedics when they arrived. Moreover, the defendant was cross-examined at length about these failures. At no time, however, was there any affirmative evidence that

the defendant's failure to call for help (and thus the delay in St. Sauveur's receiving treatment) caused her death. In fact, as previously stated, the forensic pathologist testified that St. Sauveur died a short time after taking the heroin as the result of an allergic shock.

Because there was no evidence that the defendant's failure to act caused St. Sauveur's death, the judge decided in the charge conference (held prior to closing arguments) that the jury would not be instructed that they could find the defendant guilty of involuntary manslaughter based on his omissions or delays.[2] See *Commonwealth* v. *Bastarache*, 382 Mass. 86, 104 (1980) (error for judge to instruct jury in involuntary manslaughter case that abandonment of victim could be found to be a wanton or reckless act where there was no evidence that such abandonment caused the victim's death). Defense counsel, however, had submitted this proposed instruction:

> "I emphasize to you that, in reaching your verdict on the charge of manslaughter, you may *not* base that verdict on any inaction or failure to act or delay in acting on the part of the defendant, even if you find such inaction or delay (and I am not suggesting that you should in any way.) I am simply instructing you that your verdict on this charge may only be based upon actions — actual affirmative action on his part — and not inaction or delay." (Emphasis in original.)

The judge refused to give the requested instruction (or a similar one) because he said that he was "not going to raise the issue by saying you need not consider that."

4. *Prosecutor's closing argument.* In closing argument, the prosecutor commented on the defendant's failure to act promptly or responsibly after St. Sauveur passed out in his bedroom as follows:

> "I'm going to ask you again now, when you focus in on the facts and when you apply the law the Judge gives you, concern yourselves with what he did and *what he did not do on that day.*
>
> " . . .

---

[2]The judge did not address whether the defendant had a duty to act under the circumstances.

"[B]ased on his experience and based on what he saw, he knew there was substantial harm. He knew it when he shot her up. *He knew it when she passed out. He knew it when he left her there. He knew it when she was turning blue.* He knew it and lied and lied and lied to cover up his tracks.

"...

"He knew that there could be substantial harm. He knew it from his own experience. That's why he checked her pulse and her breathing. That's why he flipped her over. And despite his knowledge, despite his observations, *he left her there, and he went down and got himself a beer.*

"...

"He made conscious decisions that day to go to Holyoke, to buy drugs, to cook the heroin, and to shoot a woman up. He made conscious decisions to inject her with a dangerous drug. *He made conscious decisions to leave her there, to let her die.*" (Emphases added).

Defense counsel lodged objections to the first three of these passages; the judge overruled them. After the prosecutor's closing argument, defense counsel offered the reason for his objections: "[H]er argument was one that was addressing what the defendant had failed to do and suggested a couple of points that could be a basis for a finding of manslaughter, the failure to act, the delay to act, being put in front of the jury." The defendant renewed his request for his proposed instruction. The judge denied it and further said that he did not find the Commonwealth's argument improper: "Certainly, the Commonwealth is entitled to focus the jury's attention on what the defendant is alleged to have done, that is, to have injected the deceased with heroin. And I'm not going to instruct the jury as you asked . . . on failure to act. I'm not going to put it in directly or indirectly."

The prosecutor's argument was based on the evidence in the case and reasonable inferences therefrom. See *Commonwealth* v. *Grimshaw*, 412 Mass. 505, 510 (1992). The defendant argues that the prosecutor attempted to convince the jury that the defendant's failure promptly to act caused the victim's death. Read in context, however, the objected-to remarks display the prosecutor's attempt to argue that the defendant was subjectively

aware of the risks of injecting heroin and that the jury could draw inferences from his conduct after St. Sauveur passed out.[3]

Even if the remarks are read in the light the defendant suggests, we do not see how the defendant was prejudiced by them. The jury were told at the outset of the case that "although opening statements and closing arguments are very appropriate and helpful, they are, themselves, not evidence." They again were instructed at the close of the case that the statements of counsel were not evidence. The judge informed the jury that they must find a voluntary act which caused St. Sauveur's death. That the jury had to find that the defendant's act of injecting St. Sauveur was the cause of her death was explained in detail when the judge, in response to a jury question,[4] further instructed that "the allegation in this case is that there was an injection of a substance into the deceased by the defendant. And it's entirely for the jury to determine whether this is a fact . . . . [I]t's alleged that the alleged injection was a wanton and reckless act." See *Commonwealth* v. *Sanna*, 424 Mass. 92, 107 (1997) (proper instructions may mitigate any prejudice from closing argument). Moreover, the defendant admitted to injecting St. Sauveur, and the forensic pathologist concluded that the heroin caused her death; there was no evidence from which the jury could have found that the defendant's conduct after the injection caused St. Sauveur's death but that the injection itself did not. Cf. *Commonwealth* v. *Osachuk*, 43 Mass. App. Ct. at 73 (internal quotation and citations omitted) ("In order to be a proximate cause of death, a defendant's conduct need not be the only cause. Rather, conduct is a proximate cause of death if, in the natural and continuous sequence, it produces the death, and the death would not have occurred in its absence").

5. *The refusal to give the defendant's requested instruction.*

[3]The judge had indicated in the charge conference that he would give an instruction on the defendant's consciousness of guilt. The judge did instruct that, if the Commonwealth had proved that the defendant "intentionally made certain false statements before or after his arrest, [the jury] are permitted to consider whether such actions indicate feelings of guilt by the defendant and whether, in turn, such feelings of guilt might tend to show actual guilt on these charges. . . ."

[4]The indictment had charged that the defendant "did assault and beat Aileen St. Sauveur, and by such assault and beating did kill said Aileen St. Sauveur." The case went to the jury, however, without objection, on the alternative *Welansky* theory. After some deliberation, the jury sent out this question: "What does assault and beat Aileen St. Sauveur, and by such assault and beating did kill Aileen St. Sauveur on verdict of manslaughter?"

Having determined that the prosecutor's argument was not improper or, in any event, was not prejudicial in light of the instructions, we reject the defendant's argument that the judge was required to give his requested instruction. "We do not require that any specific words be spoken in a jury instruction. . . . Judges need not deliver their instructions in any particular form of words, so long as all necessary instructions are given in adequate words." *Commonwealth* v. *Torres*, 420 Mass. 479, 484 (1995), and cases cited. Here, the judge properly explained the offense of involuntary manslaughter and made clear to the jury that they could not find the defendant guilty unless the Commonwealth proved beyond a reasonable doubt that the defendant injected St. Sauveur with heroin and that the injection was reckless and caused her death. There was no error.

*Judgment affirmed.*