NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-38

COMMONWEALTH

vs.

ANTHONY WINCHENBACH.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

In 2017, a Bristol County grand jury indicted the defendant, Anthony Winchenbach, for misleading a police officer in violation of G. L. c. 268, § 13B. The defendant was also indicted on charges of possession of heroin and fentanyl, G. L. c. 94C, § 34. The defendant moved to dismiss the indictment of misleading a police officer, pursuant to Commonwealth v. McCarthy, 385 Mass. 160 (1982), arguing that there was insufficient evidence presented to the grand jury that the defendant's statements could reasonably have caused an investigating officer to change the course of the investigation in a material way. After a nonevidentiary hearing, a Superior Court judge allowed the motion and dismissed the indictment for misleading a police officer. The Commonwealth appealed from the

dismissal pursuant to Mass. R. Crim. P. 15 (a) (1), as amended, 476 Mass. 1501 (2017).  For the reasons that follow, we conclude that there was sufficient evidence to establish probable cause and we therefore vacate the order dismissing the indictment for misleading a police officer.

Background.  We briefly summarize the evidence before the grand jury.  On May 18, 2017, at approximately 1 P.M., a housekeeper of the Fairfield Inn in New Bedford discovered the body of a deceased woman later identified as Rachel Golaski, the defendant's fiancé, on the floor with a hypodermic needle beside her.  A cell phone next to her body on the floor had communications from someone named "Anthony."  Golaski was twenty-two weeks pregnant.  Based on bodily fluid located on the rug and the body's lividity, police believed that someone had moved Golaski's body after her death.  None of the first responders or the inn staff reported moving the body.

Police interviewed the inn staff and learned that the defendant had arrived with Golaski at the inn the day before on May 17th.  Surveillance footage from a camera located above their inn room showed the defendant, carrying a towel, exiting his room on the morning of May 18 and making several trips toward a garbage can.  The defendant also went to the front desk and got another card key for the room.  In total, the defendant

2

made five trips in and out of his room over a thirty-minute time period.

The next day, on May 19, after being summoned back from a commercial fishing trip, the defendant was interviewed by New Bedford police officers. He told the police that he and Golaski had gone shopping before checking into the inn. He reported that he and Golaski went swimming and then he had some drinks. He informed them that Golaski may have had a small sip of alcohol but that she could not drink because she was pregnant. After falling asleep, the defendant claimed that Golaski woke him around 8 or 9 P.M. and said she was going to the store or somewhere. He said that she left the inn and claimed he did not know where she went. The defendant told the police that when she returned, Golaski seemed fine and they both went to sleep because he had to wake up early in the morning. He claimed that he got up in the morning, got all his belongings, gave her a hug and kiss, told her he loved her, and then left the inn. The defendant said that Golaski was mumbling but told him she was really tired and to "[h]ave a good trip." He claimed that he tried calling her a few times, but did not receive a response so he texted her.

The police asked the defendant if Golaski being tired was normal. The defendant responded that it was unusual and she sometimes got like that when she was on drugs. However, the

3

defendant stated that Golaski was not using drugs and had been clean "for a long time." He also stated that he had never seen her taking heroin. The defendant also said that he had also been clean for almost a year. Upon further questioning, the defendant stated that even though Golaski left the inn for some time, he did not use any drugs while she was gone, but did not know what Golaski did during that time.

The police asked the defendant many questions about his entering, leaving, and re-entering the inn in the morning. The police directly confronted the defendant about whether he saw Golaski overdose on drugs and he denied seeing it occur. He claimed that if he had seen it happen, he would have called 911 or done cardiopulmonary resuscitation himself. The defendant denied seeing Golaski with any needles.

Ultimately, after more questioning, the defendant changed his story and admitted that he used drugs with Golaski, overdosed, and at one point when he went back into the room, she had died. He claimed he passed out next to her and when he woke up, her lips were blue and she was dead. He admitted to moving her body and putting her on her side at some point; he saw vomit come out of her mouth. He claimed he then attempted to blow into her nose and mouth. He then admitted to taking the spoon and the other things she had been using to ingest drugs and putting them into the spare tire wheel well in the trunk of her

4

car.  He also told the police that he threw a number of trash bags that he claimed Golaski had filled into the garbage.

Discussion.  1.  Standard of review.  Although, in general, a "court will not inquire into the competency or sufficiency of the evidence before the grand jury," Commonwealth v. Robinson, 373 Mass. 591, 592 (1977), a "grand jury must hear sufficient evidence to establish the identity of the accused . . . and probable cause to arrest him" for the crime charged.  McCarthy, 385 Mass. at 163.  A grand jury may indict when presented with sufficient evidence of "each of the . . . elements" of the charged offense.  Commonwealth v. Moran, 453 Mass. 880, 884 (2009).  "Our review of a judge's determination of probable cause is de novo."  Commonwealth v. Coggeshall, 473 Mass. 665, 667 (2016), citing Commonwealth v. Long, 454 Mass. 542, 555 (2009).

2.  Misleading a police officer.  The witness intimidation statute, G. L. c. 268, § 13B, was expanded in 2006 to cover a broad range of crimes against public justice.  See G. L. c. 268, § 13B, as amended through St. 2006, c. 48, § 3.  "As a result, § 13B for the first time outlawed 'mislead[ing]' and 'harass[ing]' conduct, in addition to the 'threaten[ing]' and 'intimidat[ing]' conduct that the prior version of the statute had proscribed."  Commonwealth v. Morse, 468 Mass. 360, 369 (2014).  Section 13B (b) now provides in pertinent part:

5

"Whoever willfully, either directly or indirectly, . . . misleads . . . [a] police officer . . . with the intent to . . . impede, obstruct, delay, prevent or otherwise interfere with:  a criminal investigation . . . shall be punished."  G. L. c. 268, § 13B (b).

See Commonwealth v. Paquette, 475 Mass. 793, 794 (2016) (reciting elements of misleading police officer).

In this case, it is beyond dispute that the defendant changed his version of events to the police many times while giving his statement.  Although under Federal law making a materially false statement to a Federal law enforcement officer is a crime in violation of 18 U.S.C. § 1001, "our Legislature has not adopted a comparable law criminalizing all materially false statements made to State or local crime investigators." Commonwealth v. Rivera, 482 Mass. 145, 152 (2019).

In order for the defendant's lies to be part of a Massachusetts crime, they must be "misleading."  A statement is "misleading," for purposes of G. L. c. 268, § 13B, when the statement not only "was false, but that it reasonably could have led law enforcement officers to pursue a materially different course in their investigation from one they otherwise would have pursued because it sent them in the wrong direction, i.e., a 'wild goose chase.'"  Commonwealth v. Tejeda, 476 Mass. 817, 819 (2017), quoting Paquette, 475 Mass. at 800.

Before applying these definitions to the facts here, we iterate the familiar probable cause standard.  Probable cause is

6

a "considerably less exacting" standard than that required to support a conviction at trial. Commonwealth v. O'Dell, 392 Mass. 445, 451 (1984). To sustain the indictment against the defendant, the Commonwealth must provide sufficient evidence to establish probable cause, that is, "reasonably trustworthy information sufficient to warrant a reasonable or prudent person in believing that the defendant has committed the offense." Commonwealth v. Humberto H., 466 Mass. 562, 565 (2013), quoting Commonwealth v. Roman, 414 Mass. 642, 643 (1993). We review the evidence underlying a grand jury indictment in the light most favorable to the Commonwealth. See Commonwealth v. Catalina, 407 Mass. 779, 781 (1990).

Mindful of this standard, we conclude the facts set forth to the grand jury gave rise to a reasonable inference that the defendant's statements were made with the intent to mislead the police. The defendant's statements about what he and Golaski had done that evening and his lies about when the drugs were used by Golaski and whether he was involved were clearly a "content-laden fabrication designed to send police off course, thereby interfering with their investigation." Morse, 468 Mass. at 374. Obviously, any physical evidence found in the inn room would be collected and analyzed by the police because of Golaski's death. The various stories that the defendant gave about where he put the garbage could reasonably "have led law

7

enforcement officers to pursue a materially different course in their investigation from one they otherwise would have pursued because it sent them in the wrong direction, i.e., a 'wild goose chase.'" Tejeda, 476 Mass. at 819, quoting Paquette, 475 Mass. at 800.

It is unclear based on the grand jury minutes presented to the judge whether the police were actually misled or not. While that fact may be indicative, it is not dispositive. The relevant inquiry is whether the statements by the defendant reasonably "could lead" the police on a wild goose chase and not whether the defendant succeeded in actually misleading the police. See Commonwealth v. Figueroa, 464 Mass. 365, 373 (2013) ("Where the defendant attempted to mislead his parole officer with the intent to obstruct her investigation of his possible

violation of parole, it does not matter that he failed to succeed in misleading her").

Since there was probable cause to believe that the defendant's statements were misleading, the defendant's motion to dismiss should have been denied.[1]

<div style="margin-left:50%;">

Order dismissing the indictment of misleading a police officer vacated.

By the Court (Blake, Hershfang & D'Angelo, JJ.[2]),

*Joseph F. Stanton*

Clerk

</div>

Entered: February 28, 2023.

---

[1] Since we determine that the motion to dismiss should not have been allowed on this basis, we need not, and do not, reach the issue whether the defendant's conduct prior to any law enforcement involvement could constitute "misleading conduct" as suggested by the Commonwealth.

[2] The panelists are listed in order of seniority.