647 S.E.2d 736

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Marjorie Virginia GREEN, Defendant Below, Appellant.**

No. 33200.

Supreme Court of Appeals of West Virginia.

Submitted: Jan. 9, 2007.

Decided: Feb. 21, 2007.

Darrell V. McGraw, Jr., Attorney General, Robert D. Goldberg, Assistant Attorney General, Charleston, for the Appellee.

Larry D. Garrett, Karen L. Garrett, Garrett & Garrett, Moorefield, for the Appellant.

ALBRIGHT, Justice.

This is an appeal by Marjorie Virginia Green (hereinafter "Appellant") from a judgment of conviction of two counts of negligent homicide. The Appellant contends that the evidence presented at trial was insufficient to support a conviction for negligent homicide. Upon thorough review of the briefs, arguments, record, and applicable precedent, this Court reverses the Appellant's conviction.

I.  Factual and Procedural History

On Sunday, September 19, 2004, a van[1] operated by the Appellant collided with the rear of an automobile driven by Mrs. Rhonda Dante as Mrs. Dante was stopped in the eastbound lane of traffic on Route 50 near Augusta, Hampshire County, West Virginia, waiting to make a left turn into a church parking lot. The delay in Mrs. Dante's ability to turn left was occasioned by the fact that several motorcyclists were riding in the westbound lane.[2] The collision thrust Mrs. Dante's vehicle in the oncoming motorcycle traffic, resulting in the deaths of Mrs. Dante's seventeen-year-old daughter Kaitlyn, as well as Mrs. Janeann Stehle, a motorcyclist riding in the westbound lane.[3]

On January 5, 2005, a Hampshire County Grand Jury returned a two-count indictment against the Appellant alleging that she drove her van in reckless disregard for the safety of others, resulting in the deaths of Kaitlyn Dante and Janeann Stehle. On August 25, 2005, the Appellant was tried in the Circuit Court of Hampshire County. The State called Trooper Geoffrey Pasko, and the trial court qualified him as an accident reconstructionist. Trooper Pesko described Route 50 east as a downhill slope where the accident occurred. Trooper Pesko indicated that there were no pre-collision skid marks at the point of impact and found that the Appellant was driving her van approximately 59 miles per hour when she struck the rear of Mrs. Dante's car.[4]

The Appellant called accident reconstructionist Gregory Manning.[5] Mr. Manning testified that, according to his calculations, the Appellant was approximately 327 feet behind Mrs. Dante's car when Mrs. Dante first applied her brakes. Mr. Manning estimates that the Appellant failed to see Mrs. Dante's brake lights for approximately nine seconds and was only 100 feet behind Mrs. Dante's car when she first realized that Mrs. Dante's vehicle had stopped. Mr. Manning further concluded that the primary cause of the accident was driver inattention on the part of the Appellant. One of the witnesses to the acci-

---

1. The Appellant's van was a 2002 Dodge 3500 Maxivan, actually a mini-motor home, weighing approximately 5,850 pounds. Mrs. Dante's vehicle was a 2002 Oldsmobile Alero weighing approximately 3,368 pounds.

2. The motorcyclists were participating in a memory ride in honor of a motorcyclist who had previously been killed. The evidence at trial indicated that there were approximately thirty riders participating in the event.

3. There is no evidence that weather or road conditions contributed to the accident. Likewise, there is no evidence that mechanical problems contributed to the accident. The Appellant was not under the influence of alcohol, drugs, or prescription medication. The Appellant was 72 years of age and did not have a criminal record.

4. The speed limit was 55 miles per hour.

5. Mr. Manning had originally prepared his report for the Appellant's insurance company.

dent, Ms. Sara Watts, testified that she had observed the Appellant looking out the left window of her van at the motorcycles prior to the collision.

Although the Appellant did not testify at trial, the Appellant's statement as provided to the police was admitted into evidence. In that report, the Appellant indicated that she had followed a car, thought to be Mrs. Dante's car,[6] "all the way from Augusta and she kept hitting her brakes." The Appellant stated: "I thought to myself I'll be glad when I can get around her." Explaining the situation when the vehicle stopped in front of her, the Appellant stated: "I knew I couldn't get past her on the left and I knew I couldn't get by her on the right so I hit her in the butt and as far as I could see in the other lane it was nothing but motorcycles." She also indicated that she had placed approximately fifty pounds of water into her van and had recognized that the additional weight might affect the van's ability to stop or decrease speed quickly.

The jury ultimately convicted the Appellant of driving her van in reckless disregard of the safety of others resulting in the death of Kaitlyn Dante and Janeann Stehle. At a sentencing hearing conducted on October 7, 2005, the lower court sentenced the Appellant to one year on each count, to run consecutively. The lower court stayed the execution of sentence but revoked bail and placed the Appellant in jail. On September 11, 2006, the Appellant presented a petition to this Court seeking post-conviction bail pending appeal. On October 4, 2006, this Court granted the petition for post-conviction bail, as well as the petition for appeal of her convictions. This Court remanded to the lower court for the "setting of [Appellant's] bond and other conditions of bail which shall include home confinement and an absolute ban on driving." On October 27, 2006, the lower court entered an order setting bond at $10,000 and stating that the Appellant could be released from jail as soon as a plan was submitted. However, the Appellant remains in custody, based upon her loss of her home

as part of the civil suit resulting from this accident, the severe medical problems from which she suffers, and the inability of the lower court to locate a home for electronic monitoring at which her medical needs could properly be served.

On appeal of her convictions to this Court, the Appellant contends that the state failed to present sufficient evidence to support the convictions for negligent homicide and that her convictions should be reversed.

## II.   Standard of Review

■■■   The standard of review applicable in the present case was stated in syllabus point one of one *State v. Starkey,* 161 W.Va. 517, 244 S.E.2d 219 (1978), *overruled on other grounds by State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995), as follows:

> In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.

In syllabus point one of *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995), this Court further explained:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

---

**6.** There was evidence indicating that the vehicle the Appellant initially followed was not the vehi-

cle operated by Mrs. Dante.

In syllabus point three of *Guthrie*, this Court continued as follows:

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

*See also State v. Hutchinson*, 215 W.Va. 313, 318, 599 S.E.2d 736, 741 (2004).

### III.  Discussion

#### A.  West Virginia Statute and Interpreting Case Law

The Appellant was convicted under West Virginia Code § 17C–5–1(a) (1979) (Repl. Vol.2004), which provides as follows: "When the death of any person ensues within one year as a proximate result of injury received by the driving of any vehicle anywhere in this state in *reckless disregard of the safety of others*, the person so operating such vehicle shall be guilty of negligent homicide." (Emphasis supplied). An examination of the issues presented in the case sub judice requires an historical analysis of the development of this Court's definitional guidelines regarding application of the statutory phrase "reckless disregard for the safety of others." Although the legislature did not provide a definition for that phrase, the concept of reckless disregard, as a necessary predicate for a negligent homicide conviction, was proficiently explained by Justice Miller in *State v. Vollmer*, 163 W.Va. 711, 259 S.E.2d 837 (1979).[7] In that case, this Court was asked, via certified question, to determine whether the State, in charging an offense arising from an automobile accident resulting in death, could elect to proceed under either the negligent homicide statute or the involuntary manslaughter statute. In answering that question in the affirmative, this Court found specifically that the State had the option of charging under either statute because the "involuntary manslaughter crime carries the same elements and the same penalty as our negligent homicide statute in regard to a homicide arising from the operation of a motor vehicle...." 163 W.Va. at 719, 259 S.E.2d at 842.

The *Vollmer* Court endeavored to apply the principles of involuntary manslaughter to a negligent homicide prosecution. In so doing, *Vollmer* relied upon *State v. Lough*, 143 W.Va. 838, 105 S.E.2d 538 (1958), and *State v. Lawson*, 128 W.Va. 136, 36 S.E.2d 26 (1945), observing that significant confusion had been generated by the working definition of involuntary manslaughter, to the extent that a verdict of guilt on an involuntary manslaughter charge was not to be disturbed where the "death of deceased was caused by accused while engaged in an unlawful act or the performance of a lawful act in an unlawful manner." *Lough*, 143 W.Va. at 838, 105 S.E.2d at 539, syl. pt. 3. The *Vollmer* Court

---

7. This Court has also commented that "[t]he phrase 'reckless disregard for the safety of others' ... is synonymous with gross negligence." *Peak v. Ratliff*, 185 W.Va. 548, 552, n. 4, 408 S.E.2d 300, 304, n. 4 (1991). In *Hopkins v. Grubb*, 160 W.Va. 71, 230 S.E.2d 470 (1977), this Court noted that the standard for gross negligence in the operation of an automobile had been enunciated by the Virginia Supreme Court in *McDowell v. Dye*, 193 Va. 390, 69 S.E.2d 459 (1952). *Hopkins*, 160 W.Va. at 74, 230 S.E.2d at 473. The *McDowell* Court stated as follows:

Whether the conduct of a person operating an automobile amounts to gross negligence ... depends upon the facts and circumstances surrounding the operation. The element of time incident to the accident must be considered with the surrounding circumstances in determining whether the driver's conduct constitutes gross negligence. One degree of care sufficient under certain circumstances may amount to gross negligence under others. If reasonable men may differ upon the question then a jury problem is presented.

69 S.E.2d at 464.

emphasized that the confusion centered upon the phrase "unlawful act or the performance of a lawful act in an unlawful manner" and that the "genesis of the confusion is the word 'unlawful.'" *Vollmer,* 163 W.Va. at 713, 259 S.E.2d at 839. In footnote three of *Vollmer,* the Court keenly noted that "[f]rom a logical standpoint the phrase seems to contain a redundancy, since the performance of a lawful act in an unlawful manner makes the act itself unlawful." *Id.* at 713, n. 3, 259 S.E.2d at 839, n. 3.

The *Vollmer* Court found application of these amorphous principles to motor vehicle homicides to be particularly vexing based upon the fact that operation of a motor vehicle in violation of any traffic regulation statute is technically an "unlawful act." The *Vollmer* Court cautioned, however, that "these motor vehicle statutes involve acts which are *mala prohibita,* and not acts which are, *per se,* dangerous to life and limb." 163 W.Va. at 715, 259 S.E.2d at 840. This long-standing fundamental distinction between malum prohibitum and malum in se is crucial in this setting. A crime that is malum in se is "[a] crime or an act that is inherently immoral, such as murder, arson, or rape." Black's Law Dictionary 971 (7th ed.1999). Conversely, a crime that is malum prohibitum is "[a]n act that is a crime merely because it is prohibited by statute, although the act itself is not necessarily immoral." *Id.* "If the unlawful act is *malum prohibitum* the defendant generally is held not guilty of manslaughter unless the death is the foreseeable consequence of his conduct in committing the act." W. La Fave & A. Scott, *Criminal Law,* § 79, 594 (1972).

In evaluating these concepts, the *Vollmer* Court cited the reasoning of the Virginia Supreme Court in *King v. Commonwealth,* 217 Va. 601, 231 S.E.2d 312 (1977), wherein the Virginia court explained as follows:

Inadvertent acts of negligence without recklessness, while giving rise to civil liability, will not suffice to impose criminal responsibility. Thus, we have held that mere failure to keep a proper lookout is insufficient to support a conviction of involuntary manslaughter. . . . Intentional, willful, and wanton violation of safety statutes, resulting in death, however, will justify conviction of involuntary manslaughter.

231 S.E.2d at 316 (citations omitted). The *King* Court concluded that involuntary manslaughter in the operation of a motor vehicle can be defined as "accidental killing which, although unintended, is the proximate result of negligence so gross, wanton, and culpable as to show a reckless disregard of human life." *Id.* Thus, pursuant to the rationale employed in *King,* operation of a motor vehicle in violation of a safety statute, amounting to mere negligence proximately causing accidental death, was considered insufficient to support a conviction of involuntary manslaughter.

■ Analyzing the reckless disregard standard with these concepts as a foundation, the *Vollmer* Court insisted that an involuntary manslaughter charge requires *"something more* than an act of ordinary negligence or the violation of a motor vehicle statute to sustain the conviction." 163 W.Va. at 715, 259 S.E.2d at 840 (emphasis supplied). Extrapolating from the involuntary manslaughter principles, the *Vollmer* Court enunciated principles to be applied in a negligent homicide prosecution, concluding as follows in syllabus point two: "Our negligent homicide statute, W.Va.Code, 17C–5–1, requires the driving of '[a] vehicle in reckless disregard of the safety of others,' and this means that more than ordinary negligence is required. It is compatible with the involuntary manslaughter standard set in *State v. Lawson,* 128 W.Va. 136, 36 S.E.2d 26 (1945)."[8]

---

8. Interestingly, the *Lawson* Court, dealing strictly with an involuntary manslaughter issue, found that "[a] study of texts and cases discloses that the authorities are in hopeless confusion, the difference centering on whether the performance of a lawful act must, in itself, be 'unlawful' or simply 'negligent', to constitute an element of involuntary manslaughter." 128 W.Va. at 141, 36 S.E.2d at 29. At the time *Lawson* was au-

thored, West Virginia did not have a statutory definition of manslaughter and relied upon common law concepts. Turning to Virginia's treatment of the issue for guidance, the *Lawson* Court noted as follows

We think the Virginia cases have finally come to a holding that something more than simple negligence is necessary as the basis of the crime of involuntary manslaughter. It is quite

Subsequent to the extensive evaluation provided by *Vollmer*, this Court has been somewhat less diligent in faithfully applying the principles espoused by *Vollmer*. In *State v. Lott*, 170 W.Va. 65, 289 S.E.2d 739 (1982), for instance, this Court reiterated the ultimate holding of *Vollmer*, only to summarily find an absence of consequent injustice in a conviction for involuntary manslaughter where the accused had committed a negligent act and was later found unfit to drive due to poor eyesight. 170 W.Va. at 67, 289 S.E.2d at 741. The existence of evidence satisfying the *Vollmer* standard of "negligence so gross, wanton, and culpable as to show a reckless disregard of human life" was not discussed in *Lott*; nor was the particular act of the accused which ostensibly satisfied that requirement identified.

In *State v. Richeson*, 179 W.Va. 533, 370 S.E.2d 728 (1988), this Court examined the sufficiency of evidence to support a negligent homicide conviction in a manner consistent with that envisioned by *Vollmer*. In *Richeson*, the accused was driving with a broken arm and had taken a Tylenol III tablet prior to the accident which resulted in the death of another individual. The Court addressed the meaning of the phrase "reckless disregard for the safety of others" and interpreted that phrase to require "something more than an act of ordinary negligence; the standard is compatible with that used in involuntary manslaughter prosecutions brought for causing a death while operating a motor vehicle, i.e., 'negligence so gross, wanton and culpable as to show a reckless disregard of human life.'" *Id.* at 535, 370 S.E.2d at 730 (quoting *Vollmer*, 163 W.Va. at 716, 259 S.E.2d at 840–41) (additional citations omitted).

In a facet of the *Richeson* reasoning strikingly similar to the case at bar, the *Richeson*

Court observed that the "State apparently concedes that the mere fact that the appellant's vehicle crossed the center line and was on the wrong side of the road at the time of the collision, is not, alone, sufficient to support a negligent homicide conviction." 179 W.Va. at 535, 370 S.E.2d at 730. "Neither can conviction be premised solely on the appellant's unexplained failure to see the oncoming vehicle or his failure to have a valid driver's license." *Id.* Regarding such traffic violations, the *Richeson* Court explained that "[w]hile such acts or omissions may evince a failure to exercise due care, they do not ordinarily amount to gross, wanton or culpable negligence in the absence of aggravating circumstances indicating rashness or a conscious indifference to the probable dangerous consequences of driving." *Id.*

Thus, confronted with the State's apparent concession that the traffic violations alone would not justify the conviction, the *Richeson* Court inspected the trial record for evidence of gross, wanton, or culpable negligence showing a reckless disregard of human life and found none. The only aggravating circumstance presented by the State was the accused's decision to drive with a disabled arm after having ingested a prescription pain medication. There was no proof, however, that the accused's ability to drive was affected by either the arm disability or the ingestion of medication. The Court therefore reversed the conviction, concluding that the evidence adduced at trial was manifestly inadequate to support the conviction, reasoning as follows:

> While we might agree that the evidence at trial demonstrated a lack of due care on the part of the appellant in driving under these circumstances, in the absence of any showing that the appellant was or should

evident that that Court is inclined to the view that where negligence is involved as an element of manslaughter, either voluntary or involuntary, it must, to support a conviction, be shown to be gross, culpable and reckless.
*Id.* at 145, 36 S.E.2d at 30. The *Lawson* Court concluded its discussion as follows:
> On the whole we are of the opinion that the instruction which should have been given in this case was one telling the jury, in substance, that involuntary manslaughter could only be sustained upon a showing of the commission of

an unlawful act, or the performance of a lawful act in an unlawful manner. We do not undertake to form the definition of that offence. *Apparently, there have already been too many.* We simply mean to indicate that, in our view, an instruction should tell the jury that there must be either some unlawful act, or the performance of a lawful act in an unlawful manner, before a defendant can be convicted of involuntary manslaughter.
*Id.* at 149, 36 S.E.2d at 32 (emphasis supplied).

have been aware of the probable tragic consequences of his actions, the record simply does not support the conclusion that he took the wheel "in reckless disregard of the safety of others."

*Id.* at 536, 370 S.E.2d at 731.

In *State v. Storey,* 182 W.Va. 328, 387 S.E.2d 563 (1989), this Court encountered a factual scenario in which the appellant had attempted to pass a line of traffic while driving down a hill. His view of the road was partially obstructed, and there was indication that an intersection was ahead. In assessing the impact of a traffic statute violation on the ultimate resolution of the existence of reckless disregard, the *Storey* Court resurrected a concept that had been largely debilitated by *Vollmer.* The *Vollmer* Court had specifically articulated that the *Lawson* discussion of the impact of an unlawful act had created confusion in the application of the reckless disregard standard. *Vollmer* had attempted to minimize that confusion by explaining that not every traffic violation will support a conviction for negligent homicide or involuntary manslaughter. Something "more than an act or ordinary negligence or the violation of a motor vehicle statute" is necessary. *Vollmer,* 163 W.Va. at 715, 259 S.E.2d at 840. Despite that declaration in *Vollmer,* the *Storey* Court returned to the language of the 1945 *Lawson* decision and revived the principle that violation of a traffic statute, without more, can constitute recklessness sufficient to support a negligent homicide verdict.

It is a clear misapprehension of the meaning of *Vollmer* to suggest that the mere fact that the defendant's act constitutes a violation of a traffic statute, without more, is enough to satisfy the reckless disregard necessary to sustain a conviction for negligent homicide. This failure to recognize and thoroughly apply the *Vollmer* principles was evidenced again in *State v. Hose,* 187 W.Va. 429, 419 S.E.2d 690 (1992), wherein a tractor trailer driver had· a collision resulting in the deaths of a family of four. The evidence adduced at trial indicted that the driver had been on duty for twenty-one hours, exceeding the on-duty time established by state and federal laws, had driven at an excessive rate of speed, and had failed to brake in an appropriate manner. 187 W.Va. at 431, 419 S.E.2d at 692. In its legal analysis, the *Hose* Court examined the 1945 *Lawson* decision without adequately scrutinizing the limitations of *Lawson* as integrated into the law of this state by *Vollmer.* While never overtly stating the conclusion that the traffic violations, in and of themselves, justified the conviction, the *Hose* Court found the evidence sufficient to convince impartial minds of the guilt of the accused.

Likewise, in *State v. Linkous,* 194 W.Va. 287, 460 S.E.2d 288 (1995), this Court concluded that the evidence justified a conviction for negligent homicide where the accused's truck crossed the center line and struck and killed another individual. Other evidence included a reference to the fact that the accused was drinking alcohol prior to the collision and that he had engaged in reckless driving at an excessive rate of speed prior to the accident. The Court referenced the *Vollmer* standard of "negligence so gross, wanton and culpable as to show a reckless disregard for human life," but it did not methodically apply such standard to the particular facts identified as evidence in the *Linkous* case. It ultimately found sufficient evidence to support the *Linkous* conviction.

Based upon a review of the manner in which this Court has approached involuntary manslaughter and negligent homicide cases subsequent to *Vollmer,* this Court finds that the inconsistency in application of the *Vollmer* principles requires this Court to speak clearly in the present case, articulating a concise and uniform standard. In formulating such standard, a review of the methodology of other jurisdictions is beneficial.

### B. Approach Utilized in Other Jurisdictions:

The approach envisioned by *Vollmer* is consistent with that of other jurisdictions. In struggling with definitions applicable in the negligent homicide or involuntary manslaughter prosecutions, it is generally held that a heightened degree of negligence is required to justify imposition of criminal liability upon the actor. That heightened de-

gree has been designated as wanton,[9] aggravated, culpable,[10] gross,[11] reckless, or criminal.[12] Regardless of the precise term applied, the underlying concept remains; the individual's conduct must be such a departure from that of an ordinarily prudent person as to be incompatible with an appropriate regard for human life, thus characterized as a disregard of human life.[13]

As discussed by this Court in *Vollmer,* the Virginia courts have clarified that "involuntary manslaughter in the operation of a motor vehicle [is defined] as an 'accidental killing which, although unintended, is the proximate result of negligence so gross, wanton, and culpable as to show a reckless disregard of human life.'" *Greenway v. Commonwealth,* 254 Va. 147, 487 S.E.2d 224, 228 (1997) (quoting *King,* 231 S.E.2d at 316). In order to sustain an involuntary manslaughter conviction in Virginia, criminal negligence must be proved. *Tubman v. Commonwealth,* 3 Va.App. 267, 348 S.E.2d 871, 873 (1986) (quoting *King,* 231 S.E.2d at 316); *see also Kreider v. Commonwealth,* 2006 WL 3066227, *1 (Va.App.2006).

The significance of the unlawfulness of the individual's act has been the subject of frequent debate. In a concurrence to *In re Estate of Blodgett,* 147 P.3d 702 (Alaska 2006), for instance, it was noted that a "driver who breaches a standard of care set by traffic statutes and regulations is negligent." 147 P.3d at 713 n. 6 (citations omitted). However, "[i]f there is a gross deviation from

the standard of care that a reasonable person would observe the conduct could rise to the level of criminal negligence." *Id.* Similarly, in *Richardson v. Commonwealth,* 192 Va. 55, 63 S.E.2d 731 (1951), the court held that the violation of statutes defining reckless driving and prescribing rules of the road is insufficient to support an involuntary manslaughter conviction, unless the evidence further disclosed that the act is so flagrant, culpable, and wanton as to denote a reckless disregard of human life. 63 S.E.2d at 732; *see also State v. Klatt,* 544 N.W.2d 461, 462–63 (Iowa App.1995) (reversing conviction of vehicular homicide, holding that passing in no-passing zone does not constitute conscious disregard of safety of others where oncoming car was not visible and defendant had looked several times to assure a clear path to pass); *State v. Cox,* 500 N.W.2d 23, 25–26 (Iowa 1993) (reversing conviction of vehicular homicide where only evidence offered by State to prove recklessness was defendant's failure to stop and yield).

The history of involuntary manslaughter and the impact of the commission of an unlawful act were examined in *People v. Holtschlag,* 471 Mich. 1, 684 N.W.2d 730 (2004). In that case, the Supreme Court of Michigan reviewed *People v. Pavlic,* 227 Mich. 562, 199 N.W. 373 (1924), wherein the court had reasoned that where an underlying unlawful act was only *malum prohibitum* rather than *malum in se,* a conviction for

9. *See, e.g., U.S. v. F.D.L.,* 836 F.2d 1113, 1118 (8th Cir.1988); *New v. State,* 260 Ga. 441, 396 S.E.2d 486, 487 (1990).

10. *See, e.g., Hodges v. State,* 661 So.2d 107, 109 (Fla.Dist.App.1995), *Jones v. State,* 678 So.2d 707, 710 (Miss.1996); *State v. Daniels,* 87 N.C.App. 287, 360 S.E.2d 470, 471 (1987).

11. *See, e.g., U.S. v. Pardee,* 368 F.2d 368, 374 (4th Cir.1966); *State ex rel. S.T.,* 677 So.2d 1071, 1073 (La.App.1996); *State v. Albrecht,* 336 Md. 475, 649 A.2d 336, 341 (1994); *State v. Bier,* 181 Mont. 27, 591 P.2d 1115, 1118 (1979).

12. *See, e.g., State v. Brown,* 339 So.2d 6, 6–7 (La.1976); *DeLee v. Knight,* 266 S.C. 103, 221 S.E.2d 844, 845–46 (1975), *cert. denied,* 426 U.S. 939, 96 S.Ct. 2658, 49 L.Ed.2d 392 (1976); *State v. Stanislaw,* 153 Vt. 517, 573 A.2d 286, 291 (1990); *Murray v. State,* 855 P.2d 350, 357 (Wyo.

1993), *cert. denied,* 510 U.S. 1045, 114 S.Ct. 693, 126 L.Ed.2d 660 (1994).

13. Some state statutes provide extensive guidance and include a definition to be employed. In Tennessee, for example, the applicable statute provides that a person acts with criminal negligence

with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a *gross deviation from the standard of care* that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

Tenn.Code Ann. § 39–11–106(a)(4) (1997) (Repl. Vol.2006) (emphasis supplied).

involuntary manslaughter would be appropriate only with the addition of evidence specifically proving that the defendant acted with a culpable mens rea. 199 N.W. at 374. Implementing the reasoning of *Pavlic* and other cases, the *Holtschlag* court approved the rule originally articulated in *Thiede v. State*, 106 Neb. 48, 182 N.W. 570 (1921), as follows:

> We believe the rule to be that though the act made unlawful by statute is an act merely *malum prohibitum* and is ordinarily insufficient, still when such an act is accompanied by negligence or further wrong so as to be in its nature, dangerous, or as to manifest a reckless disregard for the safety of others, then it may be sufficient to supply the wrongful intent essential to criminal homicide [and] when such an act results in the death of another, may constitute involuntary manslaughter.

*Holtschlag*, 684 N.W.2d at 740 (quoting *Thiede*, 182 N.W. at 572). In footnote nine of *Holtschlag*, the court articulated the obvious "corollary of this assertion...that an unlawful act which is not malum prohibitum, but is rather malum in se, is 'in itself' a sufficient basis for a charge of involuntary manslaughter." 684 N.W.2d at 740 n. 9. The *Holtschlag* court summarized as follows:

> [T]raditionally, commission of a malum in se unlawful act that results in an unintended death is sufficient in itself to constitute manslaughter; whereas an unintended death resulting from either a lawful act or a malum prohibitum unlawful act requires specific proof of a culpable mens rea, which may consist of an intent to inflict bodily injury or of gross negligence showing a reckless disregard for the safety of another.

*Id.* at 740.

In like fashion, the Wyoming court found that "a speeding violation is an unlawful act, but only in the sense that it is malum prohibitum." *Bartlett v. State* 569 P.2d 1235, 1241 (Wyo.1977), *overruled on other grounds by Nowack v. State*, 774 P.2d 561, 565 (Wyo.

1989). "Thus, in order to sustain an involuntary manslaughter conviction, premised on the unlawful act of speeding, there must be an additional showing equivalent to criminal negligence and that death resulted as a proximate cause thereof." 569 P.2d at 1241.

The Superior Court of Pennsylvania also succinctly addressed this issue in *Commonwealth v. Clowser*, 212 Pa.Super. 208, 239 A.2d 870 (1968). The court explained that "[t]he principal question before us is whether a violation of [a statute regarding failure to yield right of way] without a finding of wanton or reckless conduct, is, per se, sufficient to sustain a conviction of involuntary manslaughter." 239 A.2d at 871. The court asserted that "[n]ot every violation of the law or unlawful act in the operation of a motor vehicle will render the operator criminally liable for a death caused thereby...." *Id.* at 873. Rather, the driver's conduct must be reckless, careless or wanton before he may be convicted of involuntary manslaughter by automobile. *Id.*[14]

In *Commonwealth v. Catalina*, 407 Mass. 779, 556 N.E.2d 973 (1990), the Supreme Judicial Court of Massachusetts discussed the infirmities in a manslaughter approach which focuses only upon the underlying unlawful act, noting that such approach allows a defendant to be found guilty of "unlawful-act manslaughter" if a death is caused by his commission of a misdemeanor or other unlawful act, without regard to the nature of the act or the dangerousness of the defendant's conduct. 556 N.E.2d at 977. The Supreme Judicial Court of Maine, in *State v. Pray*, 378 A.2d 1322 (Me.1977), identified the infirmity in this rule, as follows:

> The flaw in [this] concept is that a person may be convicted of unlawful-act manslaughter even though the person's conduct does not create a perceptible risk of death. Thus, a person is punished for the fortuitous result, the death, although the jury never has to determine whether the

---

**14.** *See also State v. Olsen,* 462 N.W.2d 474, 477 (S.D.1990) holding that "[c]riminal responsibility for death resulting from the operation of a motor vehicle in violation of the law will result only if the violation is done is such manner as to evidence a reckless disregard for the safety of oth-

ers." The *Olsen* court specified that "the operation of a motor vehicle in violation of the law is not in and of itself sufficient to constitute reckless conduct, even if a person is killed as a result thereof." 462 N.W.2d at 477; *see also State v. Janklow,* 693 N.W.2d 685, 694 (S.D.2005).

person was at fault with respect to the death. The concept violates the important principle that a person's criminal liability for an act should be proportioned to his or her moral culpability for that act. The wrongdoer should be punished for the unlawful act and for homicide if he or she is at fault with respect to the death, but should not be punished for a fortuitous result merely because the act was unlawful.

378 A.2d at 1324.

The *Catalina* court observed that the unlawful-act involuntary manslaughter approach has been severely criticized based upon the reasoning outlined in *Pray*. The *Catalina* court explained that "[t]he principle that underpins the offense perpetuates the notion of constructive crime which has been generally discredited." 556 N.W.2d at 977. The court recognized that the Model Penal Code rejects the concept of unlawful-act manslaughter completely and requires that a defendant's conduct be deemed reckless before he can be punished for manslaughter. *Id.*

### C. Resolutions and Application to the Present Case

Recognizing the unsoundness of the unlawful-act involuntary manslaughter rule, many jurisdictions have remedied the problem by requiring, either through case law or statute, that the underlying unlawful act satisfy some minimum standard of seriousness, as observed from the litany of cases examined above. Many jurisdictions focus upon the existence of a reckless disregard for the safety of others, as evidenced by the West Virginia statute,[15] while others focus primarily upon the risk to human life or safety inherent in the underlying act.[16] Where statutes provide guidance substantially similar in principle to West Virginia Code § 17C–5–1,

the clear trend of most jurisdictions is in conformity with the standards articulated in *Vollmer*.

As examined above, *Vollmer* articulated a workable standard which has not always been accurately implemented. Recent examinations by this Court have overlooked the essential detail that resolution does not *wholly* depend upon the unlawful character of the act. If such were the case, virtually every traffic accident resulting in death could become a predicate for a negligent homicide conviction. As *Vollmer* attempted to convey, it is not the *unlawfulness* of an act that justifies the conviction. A mere technical violation of a traffic safety statute will not suffice. Rather, solid evidence indicating gross, wanton, and culpable negligence showing a reckless disregard for human life must be introduced. Thus, it is improper to validate a conviction for negligent homicide and a finding of "reckless disregard for the safety of others" based solely upon the fact that the act committed by the accused was a technical violation of statute. While it is clear that there are certain situations in which the act which is in violation of a traffic statute may form the basis for a negligent homicide prosecution, such situations would be limited to those in which the act constituting the violation *also* evidences negligence so gross, wanton, and culpable as to show a reckless disregard for human life.

■ Thus, after thorough review, this Court concludes that a sound synthesis of the reasoning of other jurisdictions and the principles of *Vollmer* suggests, and we therefore hold, that a conviction for negligent homicide must not be premised solely upon the violation of a traffic statute unless the underlying act which constitutes the violation or accompanying circumstances evidence a reckless

---

**15.** *See also State v. Nosis*, 22 Ohio App.2d 16, 257 N.E.2d 414, 416–17 (1969) (unlawful act "must be one that would be reasonably anticipated by an ordinarily prudent person as likely to result in such killing") (citations omitted); *Commonwealth v. Busler*, 445 Pa. 359, 284 A.2d 783, 784 (1971) (in motor vehicle context, unlawful act must, either by itself or in conjunction with the attendant circumstances, "evidence a disregard of human life or an indifference to consequences") (citations omitted); *Darnell v. Com-*

*monwealth*, 6 Va.App. 485, 370 S.E.2d 717, 720 (1988) (unlawful act must include criminal negligence, defined as "conduct evidencing either a willful or wanton disregard for the safety of others") (citations omitted).

**16.** *See, e.g., State v. Puryear*, 121 Ariz. 359, 590 P.2d 475, 479 (1979)(approving jury instruction stating that unlawful act must be "inherently dangerous to human life").

disregard for the safety of others, characterized by negligence so gross, wanton, and culpable as to show a reckless disregard for human life.

■ In applying that principle to the present case, this Court observes that the State concedes that driver inattentiveness, standing alone, does not prove the reckless disregard necessary to sustain this conviction. The State contends, however, that the jury's finding of reckless disregard was properly based upon additional factors presented to the jury, including the presence of a large group of motorcyclists riding in the opposite direction; the clearly visible turnoff to the church; the downhill straight descent upon which the Appellant was driving; the statements of the Appellant made in the police report regarding her perception of the accident; and the testimony that the Appellant was looking at the line of motorcycles and did not see Mrs. Dante's brake lights for a period of approximately nine seconds.

From this Court's review of the record, in a light most favorable to the State, it is apparent that the Appellant failed to keep a proper watch on the highway in front of her, resulting in her inability to avoid a collision with the Dante vehicle, in violation of West Virginia Code § 17C–6–1(a) (2003) (Repl.Vol. 2004). It is likewise apparent that the Appellant was operating her vehicle at a speed above the applicable speed limit, in violation of West Virginia Code § 17C–6–1(b).

The evidence also indicates that the collision was so violent as to be characterized as an explosion, sending pieces of metal and glass thirty feet into the air. There were no skid marks at the point of impact, indicating that the Appellant did not brake significantly prior to impact. The State maintained that the Appellant failed to take any measures to mitigate the seriousness of the collision and drove, full speed, into the rear of Mrs. Dante's vehicle.

We are also mindful that the result of the collision was disastrous, capable of giving rise to fully understandable outrage in a community properly grieving the resulting deaths. However, our inquiry here must focus on the character of the Appellant's acts and omissions which produced these horrible results.

With the legal standards discussed in this opinion in mind, we have conducted an exhaustive and careful review of the record. Considering the evidence in the light most favorable to the State, including the factors emphasized by the State and the other circumstances revealed by the record and in light of those legal standards, we are compelled to conclude that the evidence is insufficient "to convince a reasonable person of the defendant's guilt beyond a reasonable doubt." *See* syl. pt. 1, in part, *Guthrie,* 194 W.Va. at 663, 461 S.E.2d at 169. We find that "the record contains no evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt" when reviewed under these legal standards. *Id.* at 663, 461 S.E.2d at 169, syl. pt. 3, in part.

■ Accordingly, this Court reverses the Appellant's convictions. Where there is evidentiary insufficiency to sustain a criminal conviction, the State is foreclosed from retrying the defendant under constitutional double jeopardy principles. *See* syl. pt. 4, *State v. Frazier,* 162 W.Va. 602, 252 S.E.2d 39 (1979) ("The Double Jeopardy Clause of the Federal and this State's Constitutions forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding").

Reversed.